ROBERT FRAZER
United States Attorney
DAVID V. SIMUNOVICH
Assistant United States Attorney
970 Broad Street, Suite 700
Newark, NJ 07102
Tel. (973) 645-2736
david.simunovich@usdoj.gov

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* AIDAN FORSYTH,<br><br>*Plaintiffs*,<br><br>v.<br><br>HARBOR HOUSE SEAFOOD, INC., *et al.*,<br><br>*Defendants*. | HON. EDWARD S. KIEL<br><br>Civ. No. 22-6543 (ESK) (SAK) |

**UNITED STATES' STATEMENT OF INTEREST**

The United States respectfully submits this Statement of Interest, pursuant to 28 U.S.C. § 517, to respond to certain arguments made in Defendants' joint motion to dismiss the First Amended Complaint (hereinafter, "Defs. MTD"). Although the United States has not intervened in this case brought pursuant to the False Claims Act (the "FCA"), 31 U.S.C. §§ 3729-3733, it remains the real party in interest, *see*

*United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 930 (2009).[1]

Because the FCA is a critical tool to redress fraud on the Government, the United States submits this Statement of Interest to be heard regarding the issue of whether the *qui tam* provision of the FCA violates Article II of the United States Constitution.[2] The United States takes no position on the overall merits of this case or whether the Relator's First Amended Complaint meets the legal requirements of Fed. R. Civ. P. 9(b).

---

[1] On March 18, 2026, the United States filed its Notice of Election to Decline Intervention in this *qui tam* action. D.E. 19-1.

[2] If the Court does not plan to reject the constitutional challenge, the United States requests that the Court certify the question to the Attorney General pursuant to Federal Rule of Civil Procedure 5.1(b) and 28 U.S.C. § 2403(a) so that the Attorney General has the opportunity to consider whether to intervene in the action. *See* Fed. R. Civ. P. 5.1(c) (the district court can "reject [a] constitutional challenge" without affording the government an opportunity to intervene but cannot "enter a final judgment holding [a] statute unconstitutional" without providing that opportunity).

**ARGUMENT**

Defendants argue that Relator's litigation of this declined *qui tam* case violates the Appointments Clause and the Take Care Clause of Article II of the U.S. Constitution. It does not.

Every court of appeals to have addressed the question has held that the False Claims Act's *qui tam* provisions are consistent with Article II. *See United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, No. 24-13581, 2026 WL 2581886 (11th Cir. Sept. 1, 2026) (vacating district court's order and holding that the False Claims Act's *qui tam* provisions are consistent with the Appointments Clause); *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 804-807 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753–58 (5th Cir. 2001) (en banc); *United States ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1040–42 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.,* 9 F.3d 743, 749–59 (9th Cir. 1993); *see also United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1155 (2d Cir. 1993) (explaining, in rejecting an Article III challenge, that the *qui tam* "provisions do not usurp the executive branch's litigating function").

District courts have followed suit. *See, e.g.*, *United States ex rel. Gonite v. UnitedHealthcare of Ga., Inc.*, 785 F. Supp. 3d 1325, 1335-36 (M.D. Ga. 2025); *United States ex rel. Butler v. Shikara*, 784 F. Supp. 3d 1277, 1296-97 (S.D. Fla. 2024); *United States ex rel. Wallace v. Exactech, Inc.*,703 F. Supp. 3d 1356, 1363 (N.D. Ala. 2023); *United States v. Halifax Hosp. Med. Ctr.*, 997 F. Supp. 2d 1272, 1278 (M.D. Fla. 2014); *United States ex rel. Butler v. Magellan Health Servs., Inc.*, 74 F. Supp. 2d 1201, 1212 (M.D. Fla. 1999); *United States ex rel. Penelow v. Janssen Prods., LP*, No. CV 12-7758 (ZNQ) (JBD), 2025 WL 937504, at *12 (D.N.J. Mar. 28, 2025); *United States ex rel. Resolution NJ LLC v. Riverside Medical Group, P.C.*, No. 2:22-cv-4165, 2024 WL 4100372, at *5 (D.N.J. Sept. 6, 2024); *United States ex rel. CLJ, LLC v. Halickman*, No. 20-CV-80645, 2024 WL 3332055, at *21 n.5 (S.D. Fla. June 14, 2024); *United States ex rel. Thomas v. Mercy Care*, 2023 WL 7413669 (D. Ariz., Nov. 9, 2023); *United States ex rel. Miller v. Manpow*, 2023 WL 8290402 (C.D. Cal. Aug. 30, 2023). Indeed, the only district court to reach a contrary conclusion was reversed on appeal. *See United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, 751 F. Supp. 3d 1293 (M.D. Fla. 2024), *vacated and remanded sub nom., Zafirov*, 2026 WL 2581886; *see also United States ex*

*rel. Gose v. Native Am. Servs. Corp.*, No. 8:16-cv-03411-KKM-AEP, 2025 WL 1531137 (M.D. Fla. May 29, 2025) (Mizelle, J.) (appeal filed).[3]

This Court should likewise reject Defendants' arguments that the *qui tam* provisions of the False Claims Act are unconstitutional.

In support of their argument, Defendants cite a 2024 decision from the U.S. District Court for the Middle District of Florida, which held that the FCA's *qui tam* provisions are unconstitutional. Defs. MTD at 20 (citing *United States ex rel. Zafirov v. Fla. Med. Assocs., LLC,* 751 F. Supp. 3d 1293, 1304–22 (M.D. Fla. 2024)). The relator and the United States appealed that decision and, on September 1, 2026, the U.S. Court of Appeals for the Eleventh Circuit vacated the district court's decision and remanded for further proceedings. *Fla. Med. Assocs., LLC*, 2026 U.S. App. LEXIS 26923 at *7-8 ("[W]e join our sister circuits that have addressed this issue and hold that the qui tam provisions of the FCA do not violate the Appointments Clause."). In reversing the District Court's decision, the Eleventh Circuit expressly considered, and rejected, the defendants' arguments (also advanced by the defendants here) that the

---

[3] The appeal in *Gose* was stayed pending the issuance of the Eleventh Circuit's decision in *Zafirov* (No. 25-12009).

FCA's *qui tam* provisions violate the Appointments Clause and the Take Care Clauses of Article II to the Constitution. *Id.* at *12-23.[4]

This Court should likewise reject Defendants' arguments that the *qui tam* provisions of the FCA are unconstitutional.

## I. Relators Need Not Be Appointed In The Manner Prescribed By The Appointments Clause

Defendants contend that the FCA's *qui tam* provisions are inconsistent with the Appointments Clause, which specifies the permissible means of appointing "Officers of the United States" to public offices "established by Law." U.S. Const. art. II, § 2, cl. 2. However, relators possess none of the indicia of officeholders within the meaning of the Appointments Clause: Their roles are limited in time and scope, confined to a particular case, and fundamentally personal in nature.

### A. Relators Do Not Occupy Continuing Positions

To be an "Officer of the United States" subject to the Appointments Clause, a person "must occupy a 'continuing' position established by law." *Lucia v. SEC*, 585 U.S. 237, 245 (2018). This requirement derives from

---

[4] Though the Defendants here have not asserted a Vesting Clause challenge to the FCA, we note that the Eleventh Circuit also considered and rejected that argument, too.

*United States v. Germaine*, 99 U.S. 508 (1789), which "held that 'civil surgeons' (doctors hired to perform various physical exams) were mere employees because their duties were 'occasional or temporary' rather than 'continuing and permanent.'" *Lucia*, 585 U.S. at 245 (quoting *Germaine*, 99 U.S. at 508, 511-512). A hallmark of an office is that its "duties continue, though the person" occupying it "be changed." *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15,747) (Marshall, C.J.). Relators' roles, in contrast, are limited in time and scope rather than continuing from officeholder to officeholder over time, and Defendants have not shown otherwise.

Relators are unlike the independent counsel or bank receivers that have been found to be officers. *See Morrison v. Olson*, 487 U.S. 654, 671 n.12 (1988) (independent counsel); *United States v. Weitzel*, 246 U.S. 533, 541 (1918) (bank receiver); *see also United States v. Donziger*, 38 F.4th 290 (2d Cir. 2000). Such roles were not specific to the individuals appointed to perform them. These offices were continuing in the crucial sense that their "duties" would "continue" even "though the person" performing them "be changed." *Maurice*, 26 F. Cas. at 1214. As the Supreme Court explained, Alexia Morrison was not even the first person

to hold her independent counsel office: The court that appointed her had initially appointed James McKay, who had resigned and been replaced by her. *Morrison*, 487 U.S. at 667. Ms. Morrison's role was thus clearly "continuing" even though it was not permanent. *Zafirov*, 2026 WL 2581886 at *15.

Similarly, the duties of a bank receiver were not limited to performance by a single individual. *See Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. at 111. If a given person appointed to act as a receiver became unable to perform his duties, that would not negate the need for a receivership; it would simply require the appointment of another receiver in place of the first. In *Stanton v. Wilkeson*, 22 F. Cas. 1074 (S.D.N.Y. 1876), another bank-receiver case, the court made this point clear when explaining that "[v]acation of office by the comptroller" of the currency, who delegated authority to the receiver, would not "vacate the receivership." 22 F. Cas. at 1074–75. And in *Donziger*, the Second Circuit—citing *Maurice*—specifically based its ruling on the premise that "the individuals appointed as special prosecutors could be replaced without the duties of the positions terminating." 38 F.4th at 297.

The role of a relator is nothing like that. If a particular relator who has blown the whistle on a fraud by filing a *qui tam* action decides she is no longer interested in pursuing the action, another person cannot simply take her place as relator. *Zafirov*, 2026 WL 2581886 at *13. The FCA states expressly that "[w]hen a person brings an action under" the *qui tam* provisions, "no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5).

Similarly, it cannot be said that role of relator is "continuing" by virtue of that fact any person can be a relator if she satisfies the statutory prerequisites. But whether multiple people can hold the so-called office of "relator" at any given time has no bearing on whether that role is continuing. What matters is whether the duty—here, litigating a *particular qui tam* action—can continue from inhabitant to inhabitant of that office, and it clearly cannot. A relator's pursuit of a *qui tam* action is personal to that relator and not transferable from relator to relator. Similarly, that an individual can serve as a relator in a particular *qui tam* case for years is irrelevant to whether a role is continuing in the meaningful sense—*i.e.*, whether the duties of the role can be passed from

one person who occupies the role to the next. An Attorney General is no more an officeholder with a continuing role if she serves four years than if she serves 100 days.

Further, a relator's *qui tam* action survives her death and may be pursued by her estate's personal representative—not a different relator—just as the estates of deceased plaintiffs routinely maintain other types of actions personal to the deceased plaintiff. *United States v. NEC Corp.*, 11 F.3d 136, 139 (11th Cir. 1993). This underscores that a relator's role is personal and unlike the duties of actual office holder, such as an Attorney General, Ambassador, or Secretary of the Treasury, whose duties are not personal in any way and are not inherited by the official's estate if she dies. *See United States ex rel. Spicer v. Westbrook*, 751 F.3d 354 (5th Cir. 2014) (bankruptcy trustee, as opposed to new relator, can assert FCA claims belonging to relator's bankruptcy estate).

The Court's Appointment's Clause analysis need not proceed any further. Because a relator does not occupy a continuing position established by law, the Court should reject Defendants' Appointments Clause challenge. *Zafirov*, 2026 WL 2581886 at *8.

### B. Congress Did Not Vest Relators With Uniquely Governmental Authority

Relators are also not officeholders subject to the Appointments Clause because Congress envisioned their roles as fundamentally personal rather than governmental in nature. In *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, the Supreme Court held that *qui tam* relators have Article III standing to sue under the FCA on the ground that the Act "can reasonably be regarded as effecting a partial assignment of the Government's damages claim" by entitling the relator to a share of any ultimate recovery. 529 U.S. 765, 773 (2000); *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 425 (2023) (same). The Supreme Court expressly rejected the theory that relators bring suit as agents of the United States. *Stevens*, 529 U.S. at 772. And in another part of the opinion holding that relators cannot pursue *qui tam* actions against States, the Supreme Court emphasized that *qui tam* actions are "private suit[s]" brought by "private parties." *Id.* at 780 n.9, 786 n.17.

*Stevens* thus recognized that when Congress authorized relators to bring *qui tam* suits under the FCA, it did not intend to create a governmental office subject to the Appointments Clause. Rather,

Congress was authorizing relators to pursue a personal monetary recovery—employing "the theory, based on experience as old as modern civilization, that one of the least expensive and most effective means of preventing frauds on the treasury is to make the perpetrators of them liable to actions by private persons acting … under … the hope of gain." *United States v. Griswold*, 24 F. 361, 366 (D. Or. 1885) (quoted in *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n.5 (1943); *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 949 (1997)).

That a relator brings a *qui tam* suit "in the name of the Government," 31 U.S.C. § 3730(b)(1), does not alter the nature of the relator's interest in the suit. The Supreme Court explained in *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, that the statutory provision for *qui tam* actions to be brought "'for the [relator] and for the … Government,'" and "'in the name of the Government,' … does not make the relator anything other than a private person" as opposed to an "'official of the United States.'" 587 U.S. 262, 272 (2019); *see also Taxpayers Against Fraud*, 41 F.3d at 1041 ("Although a relator may sue in the government's name, the relator is not vested with governmental power.").

The fact that relators decide whether to commence litigation by filing a *qui tam* complaint likewise does not make them governmental officeholders. The FCA provides that a *qui tam* action cannot proceed—indeed, it cannot even be unsealed—until after the government has had an opportunity to determine whether to "intervene and proceed with the action," intervene and move to dismiss it, or allow the relator "to conduct the action" subject to ongoing government oversight. 31 U.S.C. § 3730(b)(2)-(4). This upfront review by the government makes clear that relators are not acting as government officials when they bring suit. It is the government that determines whether the action should go forward and, if so, who should litigate it.

Relators do not act on a continuing basis, and they do not perform a function that only the government can constitutionally perform. Congress routinely chooses "to rely … on private enforcement to implement public policy." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 263 (1975). And as explained below, there is abundant evidence that Congress and the courts have historically viewed private *qui tam* suits as a constitutionally permissible means of redressing and

deterring violations of federal law. For all these reasons, relators need not be appointed in a manner consistent with the Appointments Clause.

## II. The *Qui Tam* Provisions Do Not Violate The Vesting and Take Care Clauses

The Vesting and Take Care Clauses state that "[t]he executive power shall be vested in a President of the United States" and that the President "shall take care that the laws be faithfully executed." U.S. Const. art. II, § 3. The Defendants contend that relators exercise executive power in a manner inconsistent with these Clauses, but this Court should reject that argument, too. Defs. MTD at 19-20.[5]

Congress unquestionably has the power to authorize private parties who have suffered Article III injury to sue to enforce federal statutes, like Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f) or the antitrust laws, 15 U.S.C. § 15. It is long-established that Article II "does not require Congress to prescribe litigation by the Executive as the *exclusive* means of" protecting the government's interests. *Riley*, 252 F.3d at 753. Private suits under such provisions generally do not raise Article

---

[5] Defendants do not expressly raise a Vesting Clause argument in their motion. *See* Defs. MTD at 19-20. The Government addresses both the Vesting and Take Care Clause arguments here for the sake of thoroughness.

II concerns even if Congress has created a private right of action for the purpose of supplementing government enforcement actions. The Supreme Court has routinely described private suits as a means of enforcing federal statutes for the benefit of the public, not just as a means of redressing private injuries. *See, e.g.*, *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 218 (2022) ("'[P]rivate individuals may sue to enforce' … antidiscrimination statutes[.]"); *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 502 (1969) ("Congress has encouraged private antitrust litigation not merely to compensate those who have been directly injured but also to vindicate the important public interest in free competition.").

Private suits under statutes like these differ in significant respects from *qui tam* suits under the FCA. *Qui tam* relators are authorized to pursue FCA suits solely on the basis of the government's partial assignment of a share of its right to a monetary recovery, *see Stevens*, 529 U.S. at 773, whereas private plaintiffs under other statutes must establish a personal injury as a basis for standing. A judgment on the merits in a *qui tam* action under the FCA can have claim-preclusive effect against the United States, whereas judgments in private suits under

other statutes do not. And the United States receives a share (indeed, the majority) of a monetary judgment in a *qui tam* action under the FCA, whereas judgments in private suits under other statutes are payable solely to the plaintiffs. If Congress's use of the *qui tam* mechanism were a new development, these features of *qui tam* actions under the FCA would give rise to substantial questions about whether such actions are consistent with the Vesting and Take Care Clauses of Article II.

Those questions are resolved, however, by the extensive body of evidence that *qui tam* provisions have, since the Founding, been understood as established features of American law. As the Supreme Court observed, "[s]tatutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our [G]overnment." *Hess*, 317 U.S. at 541 n.4 (1943) (quoting *Marvin v. Trout*, 199 U.S. 212, 225 (1905)). In *Stevens*, the Supreme Court reviewed this "long tradition of *qui tam* actions in England and the American Colonies," as well as the "considerable number" of statutes with *qui tam* provisions passed by the First Congress. *Stevens*, 529 U.S. at 774–77. The Supreme Court found

this body of history about the deep historical roots of *qui tam* provisions "well nigh conclusive" in the Article III context, *id.* 529 U.S. at 777, and it is just as "conclusive with respect to the Article II question" raised here. *Riley*, 252 F.3d at 752; *see Stevens*, 529 U.S. at 801 (Stevens, J., dissenting); *Butler*, 2024 WL 4354807, at *11 ("[D]ecades—nay, centuries—of litigation through the use of the *qui tam* device under the FCA undercuts [defendant's] argument" against the constitutionality of the FCA's *qui tam* provisions).

This is because legislation "'passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, … is contemporaneous and weighty evidence of its true meaning.'" *Marsh v. Chambers*, 463 U.S. 783, 790 (1983); *see also Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n*, No. 22-448, 610 U.S. 416, 432 (2024) (same); *Bowsher v. Synar*, 478 U.S. 714, 723 (1986) (same). Likewise, "'traditional ways of conducting government … give meaning' to the Constitution." *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)).

The history here shows that *qui tam* provisions are consistent with the original understanding of Article II. The First Congress enacted "a considerable number of" *qui tam* provisions, including those that "provided both a bounty and an express cause of action" for informers. *Stevens*, 529 U.S. at 776-777, 777 n.6. For example, one statute allowed "informer[s] to sue for, and receive half of [the] fine for, [a] failure to file [a] census return." *Stevens*, 529 U.S. at 777 n.6 (citing Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. at 102). Another allowed "private individual[s] to sue for, and receive half of [the] fine for, carriage of seamen without contract or illegal harboring of runaway seamen." *Id.* (citing Act of July 20, 1790, ch. 29, §§ 1, 4, 1 Stat. at 131, 133). And another allowed "private individual[s] to sue for, and receive half of [the] goods forfeited for, unlicensed trading with Indian tribes." *Id.* (citing Act of July 22, 1790, ch. 33, § 3, 1 Stat. at 137-138). The enactment of *qui tam* statutes immediately after the Founding clearly indicates that the Framers viewed them as fully compliant with Article II of the Constitution.

The Executive Branch likewise recognized *qui tam* litigation as an established feature of American law when the Attorney General included, in draft legislation in 1795, a cost-shifting provision for *qui tam*

suits. *See* 1 William S. Hein & Co., *American State Papers, Class X, Miscellaneous* 117, 121 (1998) (provision for cost-shifting in suits brought by "any informer or plaintiff, on a penal statute, to whose benefit the penalty, or any part thereof, if recovered, is directed by law to accrue"), https://perma.cc/JGR5-8AQA. This suggests that the early Executive Branch also perceived no constitutional problem with *qui tam* suits.

The Supreme Court has repeatedly recognized *qui tam* provisions as common and legitimate. For example, in *Marvin v. Trout*, 199 U.S. 212 (1905), the Supreme Court commented, while upholding the constitutionality of a state *qui tam* provision, that to reach a contrary conclusion "would be in effect to hold invalid all legislation providing for proceedings in the nature of *qui tam* actions," even though such statutes had "been in existence for hundreds of years in England, and in this country ever since the foundation of our government." *Id.* at 225. And in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), the Supreme Court found that a court of appeals construing the FCA narrowly "on the premise that *qui tam* or informer actions 'have always been regarded with disfavor'" was wrong to do so because "*[q]ui tam* suits have been frequently permitted by legislative action" and "Congress has power to

choose this method to protect the government from burdens fraudulently imposed upon it." *Id.* at 540-542. The historical record thus suggests that all three branches of the early American government accepted *qui tam* statutes as an established feature of the legal system.

Further, the FCA's *qui tam* provisions provide greater means for governmental control than the early *qui tam* statutes did. As explained *supra*, the government performs an upfront review before a *qui tam* action can proceed, or even be unsealed. *See* 31 U.S.C. § 3730(b)(2)-(4). Even if the government initially declines to intervene, it may still intervene at a later time for good cause. *See id.* § 3730(c)(2)(D)(3). And the government may move to dismiss an FCA action over a relator's objection, subject to highly deferential review under Federal Rule of Civil Procedure 41(a). *Id.* § 3730(c)(2)(A). The Supreme Court emphasized that district courts must grant dismissal "in all but the most exceptional cases … even if the relator presents a credible assessment to the contrary." *Polansky*, 599 U.S. at 437. The government may also settle a pending suit over the objections of the relator, *see* 31 U.S.C. § 3730(c)(2)(B); and veto a relator's proposed settlement or voluntary dismissal of his action, *id.* § 3730(b)(1). The United States may also stay any discovery by the

relator that "would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts," *id.* § 3730(c)(4). If early *qui tam* statutes, which lacked such controls, were understood to pose no Article II problem, then the FCA's *qui tam* provisions cannot be understood to pose any Article II problem either.

The historical context of the FCA's *qui tam* provisions demonstrates that they are consistent with the Take Care Clause and the Vesting Clause and with the original understanding of Article II. Defendants' arguments to the contrary should be rejected.

## CONCLUSION

As set forth above, the FCA's *qui tam* provisions are consistent with the Constitution. The Court should reject Defendants' arguments—as every federal Circuit Court to address these issues has done—and deny Defendants' motion based alleged unconstitutionality of the *qui tam* provisions of the FCA.

Dated: Newark, New Jersey
September 18, 2026

Respectfully Submitted,

ROBERT FRAZER
United States Attorney

*/s/ David V. Simunovich*
DAVID V. SIMUNOVICH
Assistant United States Attorney
970 Broad Street, Suite 700
Newark, NJ 07960
Tel.: (973) 645-2736
David.Simunovich@usdoj.gov
*Attorneys for the United States*

## CERTIFICATE OF SERVICE

I, David V. Simunovich, hereby certify that on September 18, 2026, I caused copies of the foregoing statement of interest to be served via email defense counsel (Mina Miawad, Esq. at mmiawad@norris-law.com, Richard DeTar, Esq. at rdetar@mdswlaw.com, and Strider Dickson, Esq. at sdickson@mdswlaw.com) and relator's counsel (Eric Jaso, Esq. at ejaso@shnlegal.com).

Pursuant to the Court's text order in this case (ECF Doc. No. 33), although the United States is serving copies of this submission on counsel via email today, the United States is not filing this submission ECF, and will rely on Defense counsel to file the foregoing statement of interest, and other motion papers on ECF under a separate docket entry.

I swear that the foregoing statements are true and correct to the best of my ability and knowledge. I am aware that I am subject to penalty for any willful misstatement herein.

Dated: Newark, New Jersey
September 18, 2026

*/s/ David V. Simunovich*
DAVID V. SIMUNOVICH
Assistant United States Attorney